# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:16CR00162 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE JOHN R. ADAMS |
| vs. | : | |
| | : | |
| RICHARD PURNELL, | : | **DEFENDANT RICHARD PURNELL'S** |
| | : | **SENTENCING MEMORANDUM** |
| Defendant. | : | |

Defendant Richard Purnell, through undersigned counsel, submits the instant Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and reviewed pursuant to Title 18, United States Code §§ 3553(a) and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ EDWARD G. BRYAN*
EDWARD G. BRYAN
Assistant Federal Public Defender
Ohio Bar: 0055556
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856 Fax: (216) 522-4321
e-mail address: edward_bryan@fd.org

1

## MEMORANDUM

**A.** *Introduction*

On May 17, 2016, Richard Purnell, was charged in a single count Indictment with engaging in commercial sex with a person, knowing and in reckless disregard of the fact that the person had not attained the age of 18 years, in violation of 18 U.S.C.§§ 1591(a)(1) and (b)(2). Mr. Purnell admitted he engaged in commercial sex with another, but denied he knew the person was under the age of 18 years, or was reckless with regard to that fact. Accordingly, Mr. Purnell exercised his right to trial by jury. Mr. Purnell's trial began on August 30, 2016, and concluded on September 6, 2016, after the jury returned a verdict of "guilty" on the single count in the Indictment.

**B.** *Procedural Sentencing Framework*

In *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in *United States v. Booker*, which requires district courts to consider the advisory Guidelines, but also permits district courts to tailor a sentence in light of the other statutory concerns set forth in 18 U.S.C. § 3553(a). Under the statutory concerns set forth in § 3553(a), district courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). *Kimbrough*, 128 S.Ct. at 570; 18 U.S.C. § 3553(a). This "parsimony provision" is "an overarching provision," representing a cap above which a district court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the Sentencing Guidelines, which, per § 3553(a), are statutorily subordinate to the parsimony principle. *See Kimbrough*, 128 S.Ct. at 570.

2

Thus, after properly calculating the advisory range under the Sentencing Guidelines, a factor which serves as only the "starting point" or "initial benchmark," district courts must then consider each of the § 3553(a) factors to impose a sentence sufficient, but not greater than necessary to fulfill the purposes of sentencing.  *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007).  The Supreme Court explained district courts may not presume the Guidelines range to be reasonable.  *Gall*, 128 S.Ct. at 596.  Further, the advisory Guidelines range is to be given no greater weight than any other § 3553(a) factor.  *Gall*, 128 S.Ct. at 594, 596-97, 602.  The Supreme Court has rejected an appellate rule requiring extraordinary circumstances or the use of a mathematical formula to justify a sentence outside the Guidelines range.  *Gall*, 128 S.Ct. at 595.  Instead, appellate courts will apply the abuse of discretion standard of review to all sentencing appeals whether a district court imposed a sentence within or outside of the Guidelines range.  *Id*. at 596.  In order to facilitate this review, the district court "must adequately explain the chosen sentence . . . to promote the perception of fair sentencing."  *Id*. at 597.  The justification must be "sufficiently compelling to support the degree of the variance."  *Id*. at 598.

District courts are afforded sentencing discretion because it is the district courts who are "in a superior position to find facts and judge their import under § 3553(a) in the individual case.  The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record."  *Gall*, 128 S.Ct. at 598.  To this end,  "when a party raises a specific, non-frivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he [or she] accepts or rejects the party's position."  *Rita v. United States*, 127 S.Ct. 2456, 2468 (2007).  Mr. Purnell now presents the following for the Court's consideration relative to the factors outlined in § 3553(a).

3

C.     *Application of 18 U.S.C. § 3553(a)'s Sentencing Factors*

    1.     *Nature and Circumstances of the Offense and History and Characteristics of Mr. Purnell*

        a.     *Nature and Circumstances of the Offense*

The writer of the Presentence Investigation Report states that the offense conduct section of the PSR is not a verbatim of the trial transcript, but "is based upon the criminal complaint, various trial exhibits, and other information provided by the Government." [R. 69, PSR, PageID 1064]. Counsel submits the nature and circumstances of the offense are best determined by a thorough, careful, and objective review of the official record of this case, most of which is the transcript of the trial held in this matter. Many of the facts in this case are not in dispute. However, some critical facts are, and the Court's determination of these facts at sentencing is vitally important to calculating a correct Sentencing Guideline range, as facts subject to interpretation are responsible for many of the offense level enhancements determined to exist by the Probation Department.

What is not in dispute is that Richard Purnell, by his own admission, engaged in sex with L.V. on at least three separate occasions, and attempted to do so on a fourth occasion when he responded to a advertisement on Backpage.com in May of 2016 that was the product of an undercover FBI sting operation. L.V. testified that she had commercial sex with Mr. Purnell on five occasions.

There was only corroborating evidence for two sexual encounters between Mr. Purnell and L.V., prior to the FBI sting on May 6, 2016, when Mr. Purnell was arrested. On October 30, 2015, there was a text message exchange between Mr. Purnell's phone and a phone number attributed to Ronnie Pratt, Jr., wherein an appointment was arranged for Mr. Purnell to have commercial sex with L.V. Both Mr. Purnell and L.V. testified that a commercial sex encounter took place at Mr.

Purnell's home in Parma on this date.  Mr. Pratt was arrested in a sting operation on November 5, 2015.  Two days later on November 7, 2015, L.V. contacted Mr. Purnell from Canton, Ohio, where authorities had placed her in a foster home after Pratt's arrest, and requested Mr. Purnell to drive to Canton and bring her back to the Cleveland area.  Mr. Purnell testified that he believed he was picking L.V. up from a rehabilitation center, which L.V. admitted she told Mr. Purnell, although she claimed she later told him it was actually a foster home when she got to Cleveland.   On this occasion, Mr. Purnell and L.V. testified they engaged in sexual relations when they arrived at Purnell's home in Parma, but money was not exchanged.

The only other evidence presented at trial concerning additional contacts between Mr. Purnell and L.V. were text message exchanges near the end of November and December 2015, where the parties attempted to make arrangements to meet for commercial sex.  However, L.V. testified that on neither occasion were they able to meet.  L.V. claimed she met with Mr. Purnell one time to engage in commercial sex after Pratt was arrested on November 5, 2015, but she "used another phone" to arrange the meeting. [R. 57, Trial Tr., PageID 555-557].

The evidence at trial revealed the FBI recovered L.V. from the streets in late December 2015, and that she remained in a locked therapeutic facility through the trial dates of August/September 2016.  Accordingly, there was no communication between Mr. Purnell and L.V. after December 2016. After being placed in a secure facility, L.V. was interviewed on a number of occasions by the FBI concerning her contacts with Ronnie Pratt, Jr., who was prosecuted by the government as the person who orchestrated, at least in part, L.V. and two other minors' commercial sex trafficking activities, and potential customers.

Because of the numerous telephone contacts L.V. had with Mr. Purnell, the FBI questioned L.V. concerning her activity with Mr. Purnell.  Mr. Purnell was identified by L.V. in her phone as "Granddad" and "Parma Play," which L.V. explained meant that Mr. Purnell was her "lick," or her way of making money on the streets."  At first, L.V. lied to investigators and told them that the person from Parma was an African American who lived in a high rise apartment building.  She also falsely claimed Mr. Purnell was married.  However when L.V. was confronted with evidence to the contrary, specifically a photograph of Richard Purnell, L.V. began to cry and admitted that she had lied about Mr. Purnell's true identity.  At the time, L.V. told law enforcement the reason she lied about Mr. Purnell's true identity was because she feared Mr. Purnell would harm her.  Counsel submits that this excuse is refuted by the fact that L.V.  contacted Mr. Purnell when she desired a ride from Canton to Cleveland on November 7, 2015.  Counsel submits the more likely reason L.V. lied about Mr. Purnell's true identity until caught in a lie by law enforcement was that she was attempting to keep Mr. Purnell as a source of income when she returned to the streets after leaving FBI custody again.

### b.     *History and Characteristics of Mr. Purnell*

Mr. Purnell, who is 55 years old, was born and raised in Barberton, Ohio.  Mr. Purnell was the middle child born to his parents.  He has two older sisters and a younger sister and brother.  Mr. Purnell has an older half sister that was born to his mother from another relationship.  Mr. Purnell reports a tumultuous childhood due in large measure to his father who was an abusive alcoholic. A couple times a week, Mr. Purnell's father became intoxicated and would become violent with Mr. Purnell's mother.  As young as 6-years-old  Mr. Purnell intervened to attempt to protect his mother. When he did, Mr. Purnell's father would turn his anger on Mr. Purnell.  When Mr. Purnell was 12

6

years old, his father broke his arm and it went untreated for 3 days.  Notwithstanding the havoc and pain caused by Mr. Purnell's father, Mr. Purnell indicated that his father normally had a "great heart."  Mr. Purnell's father died from cirrhosis of the liver in 1991.  Mr. Purnell's mother, who is 78 years old, and his siblings continue to survive and remain supportive of Mr. Purnell.

Mr. Purnell has been involved in several relationships throughout his adulthood, none of which resulted in the birth of children.  From 1981 to 1983, between the ages of 20 to 22 years, Mr. Purnell was in a long term relationship with a woman who had two teenage daughters.  Mr. Purnell was married from 1985 to 1989, but his marriage ended in divorce because he was unfaithful to his wife.  After his first marriage ended, Mr. Purnell was in a five year relationship with another woman who he married in 1995.  However, this marriage and relationship ended because of Mr. Purnell's abuse of alcohol and getting in fights.  Mr. Purnell was then in another long-term relationship with a woman that lasted from 1998 to 2006.  Mr. Purnell reports that throughout this relationship both he and his partner abused alcohol and illegal drugs.  When Mr. Purnell became sober, he ended the relationship.

Mr. Purnell has a significant history of substance abuse that began in his youth.  Starting at the age of 12, Mr. Purnell began smoking marijuana.  He also experimented with LSD and psilocybin mushrooms.  From the ages of 16 to 18 Mr. Purnell abused speed.  Beginning in his teens and continuing into his mid-40's Mr. Purnell abused cocaine.  Mr. Purnell also abused alcohol throughout his life.

On August 18, 2007, Mr. Purnell began a nearly decade long period of sobriety.  Mr. Purnell decided to change his life while incarcerated in a "drunk tank" in August of 2007.  Mr. Purnell attended 7 to 10 Alcoholic Anonymous meetings a week for approximately the first two and half

7

years of his sobriety.  His attendance tapered somewhat, but AA remained an integral part of Mr. Purnell's life until the day before his arrest on the instant charges.

Mr. Purnell has a criminal history that spans nearly 24 years.  Not surprisingly, Mr. Purnell's criminal history spans the period of time he was abusing drugs and alcohol.  His first adult conviction occurred in 1983.  His last occurred on August 17, 2007, when Mr. Purnell was arrested for OVI and Disorderly Conduct/Intoxication.  As stated above, this was the arrest that triggered Mr. Purnell's current 10 year period of sobriety.  The vast majority of Mr. Purnell's criminal history is alcohol and drug related. While maintaining his sobriety, Mr. Purnell has not run afoul of the law, not including the instant offense of conviction.

Mr. Purnell has been employed throughout his adult life.  He graduated highschool in 1979 and spent 2 years in the Navy from 1979 to 1981.  Indicative of his substance abuse problems at the time, Mr. Purnell received a bad conduct discharge from the Navy because of his drinking problem. In 1983, Mr. Purnell received a tool and die certificate from the Akron Machinist Institute.  Mr. Purnell worked as a union carpenter in roofing for many years before he started his own roofing company in 2011, RR Roofing LLC.

For the first few years following his sobriety, Mr. Purnell spent all of his time working on staying sober.  He became extremely active in 12-step programs and developed a network of individuals of recovering alcoholics and addicts to help him remain on a sober path.  During this time, to maintain focus on his sobriety, Mr. Purnell chose not to become involved in romantic relationships with others.  In fact, Mr. Purnell's last significant relationship was with an individual with whom he abused drugs and alcohol and he needed to steer clear of similar relationships to be better suited to maintain a sober lifestyle.

8

Eventually, however, Mr. Purnell desired to engage in physical contact with women again. When he broached this topic with confidants within his AA circle, it was suggested to him that he could perhaps utilize the services of a prostitute.  Later, Mr. Purnell googled "adult escorts" on his personal computer and arrived at the Backpage.com site.   Utilizing Backpage.com, Mr. Purnell began a pattern that lasted the next 4 to 5 years where he employed the services of prostitutes.  Other than when he was in the Navy overseas, this was the only period in Mr. Purnell's life where he engaged the services of prostitutes.

After his arrest in the instant matter, Mr. Purnell waived his constitutional rights to counsel and to be silent and participated in extensive interviews with members of the FBI.   During these interviews, Mr. Purnell acknowledged being subjected to sexual behavior at a very young age. Specifically, when Mr. Purnell was 7 or 8 years old, he engaged in sexual intercourse with a 13-year-old African-American female known only as "Bunchy."  Notwithstanding his young age, Mr. Purnell did not perceive these encounters, which happened on three occasions, to be abusive.  Mr. Purnell also advised agents that he was first exposed to pornography at the age of 13 and that he felt he may be addicted to pornography.  He also acknowledged impulse control problems related to sex and his Backpage.com usage.  Mr. Purnell expressed a willingness to participate in counseling related to sexual addiction issues.

As it relates to Mr. Purnell's health, it should be noted that after suffering chest pains and shortness of breath while in detention, Mr. Purnell was taken to the hospital.  Mr. Purnell was diagnosed with severe arterial sclerosis and underwent heart catheterization procedures where stents were used to stabilize his coronary arteries.

**2.      *Need for Sentence Imposed to Reflect Seriousness of Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, Protect the Public from Further Crimes, and Provide Mr. Purnell with Needed Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner***

The Probation Department's calculated guideline range of life in prison is far greater than necessary to accomplish the above purposes of sentencing and would result in a sentence that is grossly disproportionate to the harm caused by Mr. Purnell's convicted conduct.  Mr. Purnell solicited a prostitute, albeit an underage prostitute.  He should not be subject to the harshest non-capital sanction the system allows for such conduct, as objectionable as it is.  There are many more sex offenses far more sinister than what Mr. Purnell was convicted of that are not subject to the same extreme sanction that Mr. Purnell faces.

By its very nature, the sentence suggested by the Probation Department's guideline calculations, results in great disparities between the sentence Mr. Purnell faces and the ones imposed upon others convicted of similar conduct.  In fact, the related defendant, Ronnie Pratt, Jr. received a significantly less prison sentence than Mr. Purnell faces, albeit Mr. Pratt pled guilty and accepted responsibility for his conduct.  Nevertheless, Mr. Pratt pled guilty to three counts of sex trafficking involving three separate minor victims, and although he pled to multiple sex trafficking counts, the government did not seek, and the court did not impose, the 5 level enhancement for pattern of activity involving prohibited sex acts that is being sought in the instant matter. Mr. Pratt received a sentence of 168 months.

Counsel submits that even the guideline range that counsel believes is properly calculated in the instant matter, 168 to 210 months, is far greater than necessary to accomplish the purposes and goals of sentencing.  Although Mr. Pratt's sentence was imposed after Mr. Pratt received credit for acceptance of responsibility, and he was one criminal history category lower than Mr. Purnell,

10

Mr. Pratt pled guilty to three separate counts of sex trafficking involving three separate minor victims, one of whom was L.V.. Mr. Pratt was also convicted of being the "pimp" of the three minors who were trafficked in sex. According to evidence presented at trial, Mr. Pratt also benefitted financially from the sex trafficking of minors. Counsel submits that although the offense for which Mr. Purnell was convicted is a very serious offense, his role in the offense was not as aggravated as the role practiced by Mr. Pratt. Accordingly, a sentence lower than the one received by Mr. Pratt is necessary to avoid unwarranted sentencing disparities and not to give the impression that Mr. Purnell is being punished by exercising his constitutional right to trial.

### 3. The Kinds of Sentences Available

The maximum statutory sentence that Mr. Purnell faces based upon his offense of conviction is life in prison. The mandatory minimum sentence is 120 months (ten years).

### 4. The Kinds of Sentence and the Sentence Range Established for the Offense Under the Advisory Sentencing Guidelines

The United States Probation Department set Mr. Purnell's base offense level at 30, pursuant to U.S.S.G. § 2G1.3 (a)(2). Counsel agrees that offense level 30 is the correct base offense level for Mr. Purnell's offense of conviction.

The Probation Department adds a 2 level enhancement pursuant to U.S.S.G. § 2G1.3(b)(2)(B), asserting Mr. Purnell unduly influenced L.V. to engage in prohibited sexual conduct. In determining if the enhancement should be applied, the probation officer relies, in part, on the rebuttable presumption that the enhancement applies if the defendant is 10 years older than the victim. The probation officer also relies on facts disputed at trial to find Mr. Purnell unduly influenced L.V. to engage in prohibited sexual conduct. However, a proper analysis of the relevant facts reveals the above presumption based upon the greater than 10 year difference in the ages of

11

Mr. Purnell and L.V. has been rebutted and should not be applied.

The probation officer cited the fact Mr. Purnell picked L.V. up on one occasion in Canton, Ohio and brought her back to his home to engage in sex as evidence that supported the enhancement. The probation officer also stated that L.V.'s claim Mr. Purnell had a weapon in his room and threatened to kill her if she told anyone "compromised the voluntariness of the minor's behavior during some of the offense conduct." [R. 69 PSR, ¶ 52, PageID 1072].

An objective review of the record in this matter does not support the assertion Mr. Purnell unduly influence L.V. to engage in prohibited sexual conduct.  Accordingly, Mr. Purnell objects to this enhancement.  Regardless of the fact L.V. told FBI agents at one time she initially lied about Mr. Purnell's identity to the agents because she was afraid he would harm her because he had a firearm in his bedroom and he claimed he would use it if she told on him, L.V.'s testimony at trial did not support this claim.  On direct examination when the government asked L.V. why she initially lied about Mr. Purnell's true identity she said, "because I was scared."  When asked why she was scared,  L.V. responded: "because he might find me."[R. 57, Trial TR., testimony of L.V., PageID 493].

The government later returned to the topic of  L.V.'s purported fear of Mr. Purnell and the source of that fear.  The government first had L.V. identify Government's Exhibit 3-18, which was a picture of Mr. Purnell's couch with a shotgun on it.  The government asked L.V. "Was there a conversation about it?" To which L.V. replied, "No."  The government then attempted to lead L.V. by asking, "Was there ever a conversation about what could happen?" To which defense counsel objected and the court sustained.  The government then asked, "What conversations did you have with the defendant about telling people who he was?"  L.V. responded, "He said he would do

something to me."  The government asked, "Did he specify what?" L.V. responded, "No."[R. 57, Trial Tr., testimony of L.V., PageID 495-496].

It is clear the government was attempting to elicit from L.V. the same story she conveyed to the FBI when they questioned her the previous February concerning Mr. Purnell's true identity. She stated she lied about Mr. Purnell's true identity because she feared him because he threatened he would shoot her with a shotgun that he kept in his bedroom if she told anyone about him.  When this topic was approached during L.V.'s direct examination, she did not say she was threatened with the shotgun even after the government prompted her with a picture of the firearm in the context of her expressing her fear of Mr. Purnell.  The lack of consistency between what L.V. told the FBI during an earlier interview and what she testified to at trial is evidence that L.V. contrived the story that Mr. Purnell threatened her with a gun to engender sympathy from the FBI agents, who had caught L.V. in an obvious lie about Mr. Purnell's true identity.

The real reason L.V. lied about Mr. Purnell's identity is found in the very manner in which she identified Mr. Purnell in her cell phone–"Parma Play." As L.V. explained in her own words, a "play" was a "lick," which was a way of making money on the streets.  L.V. acknowledged Mr. Purnell was one of her ways of making money on the streets. [R. 57, Trial Tr., testimony of L.V., PageID 542].  L.V.'s supposed fear of Mr. Purnell is belied by the fact that when safely under the control of the FBI and Social Service agencies after L.V. was "recovered" from the streets by the FBI on November 5, 2015, L.V. walked away from a therapeutic foster home and reached out to the person she later claimed she was afraid of, Mr. Purnell, for a ride from Canton back to the Cleveland area.

Ironically, it was Mr. Purnell's willingness to travel to Canton and return L.V. to the Cleveland area that the probation officer cites as further evidence Mr. Purnell "unduly influenced" L.V. to engage in a prohibited sex act.  Contrary to the probation officer's characterization of this incident, L.V. admitted she first reached out to Mr. Purnell for a ride from Canton to Cleveland.  In fact, she admitted she had to beg Mr. Purnell to come and get her.   She also admitted she did not initially tell Mr. Purnell that she was at a foster home; but instead, said she was at a rehabilitation facility.[R. 57, Trial Tr., testimony of L.V., PageID 546-547].

It was clear from the overwhelming evidence presented at trial that Mr. Purnell did not "unduly influence" L.V. to engage in a prohibited sex act.  In fact, the overwhelming evidence supported the conclusion that L.V. acted solely of her own volition in the sex acts in which she engaged with Mr. Purnell, as well as everyone else in which she engaged in commercial sex. Notwithstanding L.V.'s claims she was "abducted" by Ronnie Pratt and forced into a lifestyle of prostitution,[1] L.V. admitted she fled the FBI and community resources and returned to the streets to prostitute even after Pratt was arrested and detained for his conduct simply because "she needed to eat."[R. 57, Trial Tr., testimony of L.V., PageID 507]. Obviously, the authorities would have insured that L.V. had plenty to eat, not to mention her other needs.  The overwhelming evidence presented at trial was that L.V. chose to return to the streets to prostitute because of her own desire. Ronnie Pratt, Jr. stated in an affidavit filed on behalf of Mr. Purnell's Motion for a New Trial that L.V. had many customers, 30 or more, mostly older white men.  L.V. did not continue to engage in this lifestyle because she was afraid of her customers.  She engaged in this lifestyle because it was

_____

[1]Which is refuted by the fact the government chose not to prosecute Ronnie Pratt, Jr. for forcing L.V. to engage in prostitution, but basing his criminal liability on L.V.'s status as a minor.

14

her "lick," her way of making money on the streets, a place L.V. chose to be, rather than the safe arms of persons dedicated to protect her from the streets.

L.V.'s behavior was volitional, not unduly influenced by Mr. Purnell, or anyone else for that matter.  Accordingly, the 2 level enhancement pursuant to USSG § 2G1.3(b)(2)(B) asserting Mr. Purnell unduly influenced L.V. to engage in prohibited sex acts should not be imposed.

The Probation Department also enhances Mr. Purnell's offense level by 2 levels pursuant to USSG § 2G1.3(b)(3) because he used a computer to solicit and facilitate sexual contact with a minor.  Based upon the conviction and the facts of the case, Mr. Purnell concedes the enhancement is appropriate.

The Probation Department also enhances Mr. Purnell's offense level by 2 levels pursuant to USSG § 2G1.3(b)(4)(A) because the offense involved the commission of a sex act.  Based upon the conviction and the facts of the case, Mr. Purnell concedes the enhancement is appropriate.

The Probation Department next enhances Mr. Purnell's offense level by 2 levels pursuant to USSG § 3C1.1 for obstruction of justice.  Mr. Purnell objects to this enhancement.  In finding the obstruction enhancement to be appropriate the probation officer cites several factors. First, the probation officer states Mr. Purnell's testifimony that he did not know the age of the minor was false because this testimony was contradicted by the minor who testified she told Mr. Purnell her actual age.  Next, the probation officer cites the fact that Mr. Purnell deleted a recent text message exchange he had with undercover law enforcement officers prior to allowing law enforcement to enter his home as evidence he obstructed or impeded the administration of justice. Finally, the probation officer again cites the testimony of the complainant that she was threatened by Mr. Purnell that she would be killed if she exposed his illegal conduct as evidence he obstructed

15

and impeded the administration of justice.

Mr. Purnell addresses the probation officer's justification for the obstruction enhancement in reverse order.  As it relates to L.V.'s claims her life was threatened by Mr. Purnell if she exposed his (and I guess her) illegal conduct to others, such claims were debunked, *supra,* regarding Mr. Purnell's objection to the "undue influence" enhancement.  As stated above, an objective review of the entire record reflects the more credible explanation when it comes to L.V.'s claims her life was threatened are that they were contrived to curry favor with the FBI when they caught her in a lie regarding Mr. Purnell's true identity.  It is clear when one considers all of the evidence in its proper context that L.V. lied in an effort to preserve Mr. Purnell as a source of income when she returned to the streets, as she had done before after being recovered by the FBI.  When the FBI caught her lying, she claimed Mr. Purnell threatened her.  Since the claim Mr. Purnell threatened L.V.'s life is not credible, such threat cannot be used as a justification for the obstruction enhancement.

Next, although Mr. Purnell admittedly deleted a recent text exchange with a person who turned out to be an undercover FBI agent, a fact he readily admitted during his testimony at trial, the evidence is insufficient he did so with the intent to impede the administration of justice.  This is the case because immediately after deleting the text message exchange, Mr. Purnell waived his constitutional rights and agreed to make a full statement to law enforcement, which resulted in him in admitted that he was the one who had been texting with the undercover agent.  In his statement, which took place over a number of days, Mr. Purnell fully admitted his conduct to the agents.  In fact, he volunteered information, such as the fact he picked L.V. up from Canton, he had no idea law enforcement already knew.  Although Mr. Purnell denied he knew L.V.'s actual age, and stated he believed she was an adult, he admitted he was involved in the under cover text exchange trying to

16

arrange a sexual encounter with "persons" who stated in the text exchange they were 17-years-old and younger.  The bottom line is Mr. Purnell did not impede the government's investigation by his actions, he assisted in his own prosecution by his willingness to be cooperative and make a full statement.

As it relates to the probation officer's position that Mr. Purnell obstructed justice by engaging in perjury when he testified at trial, this position again rests with the credibility, or lack thereof, of L.V.'s testimony regarding her claims she told Mr. Purnell her true age.  L.V. told several different versions of the story when she claimed she informed Mr. Purnell of her true age.  The stories vary from telling Mr. Purnell her true age on a later occasion after she first met him, to stating she told Mr. Purnell her true age the very first time she met with him.

On direct examination, the government asked L.V. if there came a time when she told Mr. Purnell her true age?  Specifically, the government asked, "Do you know, was that early on when you first started seeing him? Or was that later?" L.V. answered, "Later on."  The government clarified, "So there was at least a couple occasions where you were with him and you had not specifically said your age?"  L.V. stated, "Yes." [R. 57 Trial Tr. testimony of L.V., PageID 487-488].  On cross examination, counsel sought clarification on the first time L.V. allegedly revealed her true age to Mr. Purnell.  Counsel asked, "Okay.  Now, let me ask you something about when you told him that you were actually 14 years old.  When was that in relation to the time he came down to get you in Canton?"(November 7, 2015) L.V. answered, "As soon as we got to his house, I told him my age."  Counsel sought further clarification, "Okay.  So it was on that occasion that you told him your age?"  L.V. responded, "Yes, and also other occasions, too."  Counsel asked, "Okay.  What other occasions?"  L.V. responded, "When Ronnie would bring me there, I told him my age."  [R.

17

57 Trial Tr. testimony of L.V., PageID 547].   Since Mr. Pratt was incarcerated when Mr. Purnell

brought L.V. back to Cleveland from Canton, if L.V. told Mr. Purnell her true age "when Ronnie

would bring me there," it would have had to be on occasions earlier than the November 7, 2015 trip

from Canton.   Apparently perplexed by her answers to this question on cross examination, the

government re-visited the timing of L.V.'s alleged disclosure of her true age to Mr. Purnell on re-

direct examination.  The government inquired, "When Rick, the defendant, asked you 'how old are

you really,' what did you say?"  L.V. said, "I told him my age."  The government asked, "Was that

the first time you met him?"  L.V. stated, "Yes."[R. 57 Trial Tr. testimony of L.V., PageID 561].

 During the course of a direct and cross examination that took place over a couple of hours

on one trial day, L.V. gave two nearly opposite versions of the critical story of when she first

informed Mr. Purnell her true age.  At the beginning of her testimony, she clearly stated that she

informed Mr. Purnell of her true age "later on" in the scope of their interactions.  This is important,

because if L.V. told Mr. Purnell her true age on a later occasion, perhaps the last time, Mr. Purnell

met with her, it could be argued that Mr. Purnell should have only been on notice regarding the age

of L.V. for any incidents of commercial sex that followed the notification.   However, if L.V.

informed Mr. Purnell of her true age the very first time they met, Mr. Purnell would have been on

notice from the beginning of his interactions with L.V. that she was a minor.  The fact that L.V.

contradicts herself so blatantly on this important issue demonstrates her story is not credible.  Mr.

Purnell was always adamant that L.V. never told him her true age.  In light of the problems

concerning L.V.'s recitation of this issue, it cannot be said that Mr. Purnell perjured himself

regarding his lack of knowledge of L.V.'s true age, as it is very likely, based upon the evidence, L.V.

lied when she said that she told Mr. Purnell her true age.  In fact, L.V. testified she lied about her

age and said she was older than she was in order to make sure she was able to secure prostitution appointments.

Furthermore, the fact Mr. Purnell was ultimately convicted does not mean that he perjured himself when he testified.  Mr. Purnell could have been convicted if the jury determined on at least one occasion he engaged in a commercial sex act with L.V. knowing she was a minor, ***or was reckless*** in regards to L.V.'s status as a minor.  The fact Mr. Purnell's counsel later argued the existence of reasonable doubt regarding the element whether Mr. Purnell knew L.V. was a minor, or was reckless with regard to her age, does not mean Mr. Purnell tendered false testimony, especially since the recklessness standard is subject to interpretation where reasonable minds might differ.

For all of the above-stated reasons, Mr. Purnell objects to the 2 level enhancement for obstruction of justice.

The Probation Department enhances Mr. Purnell's offense level by 5 levels pursuant to USSG § 4B1.5(b)(1), alleging Mr. Purnell engaged in a "pattern of activity" involving prohibited sexual conduct.  In this instance, the probation officer states that since Mr. Purnell admitted to engaging in prohibited sexual conduct on two or more occasions, he admitted to engaging in a "pattern of activity."  Mr. Purnell never admitted to engaging in "prohibited" sexual conduct, at least not in the manner in which he was charged in the Indictment.  In fact, Mr. Purnell was charged with one count of engaging in prohibited sexual conduct with a minor.  Accordingly, the government was not required to prove, and the jury was not required to find, that Mr. Purnell engaged in more than one prohibited sex act, in this case commercial sex with a minor, for Mr. Purnell to be convicted of the single count in the Indictment.  In fact, Mr. Purnell's conviction could have rested on the

19

allegation that Mr. Purnell attempted to arrange a commercial sex act when he responded to the Backpage advertisement that was the product of the FBI sting operation. In that instance, the agent injected the topic of the ages of the purported sex trafficking participants in an unequivocal manner. Even without a completed sex act, there was arguably sufficient evidence for the jury to convict Mr. Purnell based upon the elements of the offense since the only *actus reus* required for sex trafficking is a solicitation for commercial sex with someone known to be a minor, or while acting reckless with regard to the age of the participant. Since the jury in Mr. Purnell's case was only required to find him guilty of one prohibited sex act based upon the single count in the Indictment, a count that spanned the time period of the government's investigation regarding Mr. Purnell's activity with L.V., it cannot be said that there was clear evidence, or even evidence by a preponderance of the evidence, that Mr. Purnell engaged in a "pattern of activity" involving prohibited sexual activity. Accordingly, Mr. Purnell objects to the 5 level enhancement found by the Probation Department for pattern of activity involving a prohibited sex act.

Mr. Purnell does not dispute that he is in a Criminal History Category of II. If the Probation Department's Sentencing Guideline calculations are correct, Mr. Purnell would be an Offense Level 43, Criminal History Category II, resulting in a Sentencing Guideline range of life in prison. If, however, Mr. Purnell's objections to the Probation Department's calculations are sustained, he would be an Offense Level 34, Criminal History II, resulting in Sentencing Guideline range of 168 to 210 months.

### 5. *Pertinent Policy Statements by the Sentencing Commission*

There are no pertinent policy statements by the Sentencing Commission application to the instant case.

### 6.    *Motion for Downward Variance*

Especially if the Probation Department's Federal Sentencing Guideline calculation is determined by the Court to be correct, a significant variance from the computed guidelines would be necessary to meet the statutory requirement that Mr. Purnell's sentence be sufficient, ***but not greater than*** necessary, to accomplish the purposes and goals of sentencing.  In fact, the probation officer identifies the disparity in sentencing faced by Mr. Purnell as compared to the sentence Mr. Pratt received, 168 months, in a related case as a ground that warrants a variance below the calculated guideline range. The probation officer also suggests that the physical and sexual abuse that Mr. Purnell suffered as a child is another basis for a downward variance. [R. 69, PSR, ¶¶ 140-141, PageID 1085].  Counsel agrees with the Probation Department that both basis represent circumstances that warrant a downward variance from the calculated guideline range.

In addition, counsel submits a sentence of life in prison for the offense conduct in this case represents a disproportionately harsh sentence which borders on the Eighth Amendment's prohibition against excessive and gratuitous punishments.  The nature of Mr. Purnell's conviction, albeit very serious, does not require a *mens rea* beyond recklessness for a person to be convicted. While it is very serious conduct to engage in a commercial sex act with a minor, the law does not require the offender know the person with whom they are engaging in commercial sex is a minor. The law merely requires the person is reckless with regard to the person's age.  Congress has even modified the recklessness standard by stating a jury may find recklessness has been proven by the government if the defendant has a "reasonable opportunity to observe" the minor.

In essence, Congress has watered down the culpability level of what the government is required to prove to find a person guilty of commercial sex with a minor.  The fact is sex trafficking

21

can be proven to have taken place in multiple ways, many of which are far more serious than the manner in which Mr. Purnell's offense of conviction suggests.  If a person forces someone to engage in commercial sex, such conduct is punishable under the sex trafficking statute.  If a person has commercial sex with a minor, whether the minor was forced or not, such conduct is punishable under the sex trafficking statute as well.  If a person forces a minor to engage in commercial sex, such conduct is also punishable under the sex trafficking statute.  There are varying degrees of culpability involving sex trafficking, but all of them are punishable under the sex trafficking statute.  When USSG § 4B1.5(b)(1) is used to enhance a "covered sex crime," which Mr. Purnell's offense of conviction, 18 U.S.C. § 1591(a)(1), admittedly is, it results in a gratuitous increase in the person's offense level if the person engaged in the offense conduct "two or more" times.  The history of prostitution reveals that it is not usually something that is engaged in simply one time in the average participant's life, whether the participant is the prostitute, or the person visiting the prostitute.  Accordingly, it results in an overly harsh application of the rationale behind the guideline's enhancement provisions.  While a person who engages in multiple acts of *forced* prohibited sexual conduct should perhaps be a candidate for harsher treatment under the guidelines, it is incongruous to punish a person who engages in consensual, yet prohibited, sexual conduct 5 levels more responsible under the guidelines because the conduct occurred on two or more occasions, especially when the 5 levels in enhancements represent decades more punishment than the person would otherwise face.

Since the sentencing guideline range calculated by the Probation Department in the instant case obliterates the parsimony provision of 18 U.S.C. § 3553(a) by arriving at a sentencing range that is clearly far greater than necessary to accomplish the statutory purposes and goals of

22

sentencing, this Honorable Court must exercise its authority to impose a downward variance to arrive at a statutorily mandated minimally sufficient sentence.  Mr. Purnell submits that such a sentence is represented by the statutory mandatory minimum sentence he can receive for his offense of conviction, which is 120 months incarceration.

**D.    Conclusion**

For all of the reasons stated above, Mr. Purnell respectfully submits a reasonable sentence in the instant matter is 120 months incarceration.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ EDWARD G. BRYAN*
EDWARD G. BRYAN
Assistant Federal Public Defender
Ohio Bar: 0055556
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856 Fax: (216) 522-4321
e-mail address: edward_bryan@fd.org.

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2017, a copy of the foregoing Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ EDWARD G. BRYAN
EDWARD G. BRYAN
Assistant Federal Public Defender
Ohio Bar: 0055556